UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| In Re: | Case No.: | 20-23404-ABA |
| Frank D. Formica, | Chapter: | 7 |
| Debtor. | Judge: | Andrew B. Altenburg, Jr. |

### MEMORANDUM DECISION

Frank Formica was selling his former residence. Parke Bank took the position that, in addition to its first mortgage on the property, it had a $1.1M lien resulting from a cross-collateralized commercial loan with Mr. Formica. When asked for a payoff statement, Parke supplied the title company with one that included the commercial loan. When Mr. Formica's attorney objected that the two loans were not cross-collateralized, Parke's attorney offered to settle for $35,000 to $40,000. After substantial back and forth between the attorneys, Mr. Formica finally agreed to pay Parke $10,000 extra. He now contends that by demanding this payment, Parke violated the automatic stay by an act to "recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

After review of the briefs filed, the documents submitted in contention therewith, and the audio of hearings held January 26 and March 17, 2021, the court concludes that while Parke had no right to the additional $10,000, because it only communicated with Mr. Formica's attorney and because Mr. Formica consented to the payment, Parke is not liable for violation of the automatic stay. Accordingly, the court will deny the debtor's motion.

### JURISDICTION AND VENUE

As will be explained below, the court has jurisdiction over this dispute pursuant to 28 U.S.C. § 157(b)(2)(O), 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

# PROCEDURAL HISTORY

On February 1, 2021, Mr. Formica filed a Motion for Sanctions for Violation of Automatic Stay, Sanctions Against Parke Bank. Doc. No. 29. Parke filed a response on February 23, 2021, Doc. No. 31, and Mr. Formica filed a response to that on March 1, 2021. Doc. No. 33. The court held a hearing on March 17, 2021. The parties filed further briefs on April 5 and April 15, 2021. This matter is now ripe for disposition.

# FINDINGS OF FACT

Mr. Formica entered into a commercial loan (the "Commercial Loan") with Parke Bank on September 20, 2016 and a residential loan (the "Residential Loan") on May 22, 2017.

In the Commercial Loan, Mr. Formica and his wholly-owned company, John Galt, LLC, entered into a Loan and Security Agreement for $1,100,000 on September 20, 2016. Doc. No. 31-3, p. 1. Mr. Formica and John Galt were designated as borrowers, and Mr. Formica, John Galt, LLC, Formica Brothers, LLC, Baker Boys, LLC, and Don Cheech Limited Liability Company (all Formica companies[1]) were designated as guarantors, with all borrowers and guarantors also designated as Obligors. *Id.* A separate Guaranty Agreement of the Commercial Loan executed by Mr. Formica, only, was unsecured. Doc. No. 31-3, p. 25.

The Commercial Loan was secured by six commercial properties in Atlantic City (the "AC Properties"), as well as personal property owned by the mortgagors located on the AC Properties. Doc. No. 31-3, p. 13. The Residential Loan was secured by 153 Glenside Avenue, Linwood, New Jersey (the "Linwood Property"). Doc. No. 31-2, p. 8, ¶ 3.

Parke bases its cross-collateralization on three paragraphs of the Commercial Loan's Mortgage and Security Agreement. Debt is defined as:

> "Debt" means the principal sum of One Million One Hundred Thousand Dollars ($1,100,000.00) loaned by Mortgagee to Mortgagors, or which the Mortgagors have guaranteed, with interest thereon at the rate or rates specified in, and represented by a Commercial Mortgage  Note, bearing even date herewith, payable to the order of Mortgagee (the "Note") as well as any extensions, modifications and renewals thereof, and all other indebtedness of the Mortgagors to the Mortgagee of any nature whatsoever, whether now existing or hereafter arising[.]

*Id.*, p. 14, ¶ 1.1. Thus, debt under the Commercial Loan would include any of Mr. Formica's future indebtedness to Parke.

Paragraph 24 then provides:

---

[1] Formica Brothers filed a no asset chapter 7 case on April 5, 2019, docketed at Bankr. No. 19-17000-ABA. Baker Boys also filed a no asset 7 on April 5, 2019, docketed at Bankr. No. 19-17002-ABA. John Galt, LLC filed a no asset chapter 7 case on March 15, 2021, docketed at Bankr. No. 21-12050-ABA.

**24. Cross Collateral/Cross Default.** This Mortgage shall secure, in addition to the Debt evidenced by the Note and secured hereby, all other obligations of Mortgagors, their successors or assigns, whether oral or written, secured or unsecured, and regardless of their nature, and shall also secure any and all such future obligations, when they are incurred. This covenant shall be effective without the execution of any affirmative action by Mortgagors. In the event that the Mortgagors shall default under any other obligation or mortgage held by Mortgagee and made by Mortgagors, such default hereunder and under the Note which the Mortgage secures, shall be immediately due and payable, anything to the contrary herein notwithstanding. In the event that Mortgagors shall default under this Mortgage, such default shall constitute an Event of Default under any and all obligations and mortgages of Mortgagors to Mortgagee, and Mortgagee, at its option, may declare all such obligations and mortgages immediately due and payable.

Doc. No. 31-3, ex. B, p. 19, ¶ 24. Read with the definition of "debt," paragraph 24 makes the collateral of the Commercial Loan also liable for any future debt of Mr. Formica, as well as making any default under any future obligations or mortgages a default under the Commercial Loan, and vice versa.

Finally, paragraph 18 of the same document states:

**18. Other Security.** If the Debt is secured at any time by a lien on or a security interest in any other real or personal property under any mortgage or security instrument executed and delivered by Mortgagors or any other person (corporate or individual), Mortgagors consent to the Mortgagee's exercising with respect thereto any of the rights herein and therein provided, at Mortgagee's option and without obligation to have the Mortgaged Property and such other real and personal property marshalled. . . .

Doc. No. 31-3, ex. B, p. 18, ¶ 18.

Here, Mr. Formica consented to Parke exercising any of its rights under the Commercial Loan and any future secured loan at Parke's option and without the obligation to have any of the collateral marshalled, i.e., it could execute against any collateral, regardless of the security interests of junior lienholders. This does nothing to make future collateral liable to the Commercial Loan.

That the Commercial Loan only provided that just its collateral (the AC Properties) secured future debt is evident in the provision that:

In addition to any other paragraph of this Mortgage and notwithstanding any term, condition or covenants hereof to the contrary, this Mortgage secures the present obligation of the Mortgagors as well as any other obligations of the Mortgagors to Mortgagee. These obligations shall include present and future obligations, whether direct, indirect, primary, secondary, fixed or contingent.

Doc. No. 13-3, p. 14.

On May 22, 2017, Mr. Formica and his wife, Amy, executed the Residential Loan with Parke for $320,000, secured by the Linwood Property. Doc. No. 31-2, ex. A, p. 2. Parke alleged that the Residential Loan had a cross-default provision, Doc. No. 31-1, p. 3, ¶ 9, but it does not. *See* Doc. No. 31-2, pp. 11-12, ¶ 24.[2] As future "debt" for purposes of the Commercial Loan, the Residential Loan was also secured by the AC Properties. But as just explained, nothing in the Residential Loan documents provided for the Linwood Property to be liable for any prior loans.

In May 2020, Amy Formica purchased the couple a new home located at 618 Hays Road, Absecon, New Jersey (the "Absecon Property"),[3] and the couple moved there at the end of June 2020. Doc. No. 35, p. 2, ¶ 5. To finance the purchase, Ms. Formica borrowed $150,000 from Nicolette Property Group, getting a bridge loan with a maturity date of May 20, 2021, as she allegedly could not qualify for a conventional mortgage while a mortgagor on the Linwood Property. *Id.*, p. 2, ¶¶ 6-8. In connection with this purchase, Ms. Formica allegedly granted a mortgage on her interest in the Linwood Property. Doc. No. 29-1, p. 2, ¶ 10(c). Mr. Formica did not disclose the purchase price of the Absecon Property or explain why his wife needed to grant the mortgage on the Linwood Property.

The Formicas listed the Linwood Property in June 2020 for $449,000. Doc. No. 35, p. 2, ¶¶ 5, 9. After 40 showings, they accepted the highest offer of $440,000.[4] Doc. No. 35, pp. 1-2, ¶¶ 3-4; Doc. No. 35-1, p. 1, ¶ 4. That offer fell through when the Formicas declined to make "tens of thousands of dollars of repairs." Doc. No. 35, p. 2, ¶ 4; Doc. No. 35-1, p. 1, ¶ 5.

On December 9, 2020, Mr. Formica filed a no asset chapter 7 case. Doc. No. 1. On December 22, 2020, despite it being property of the chapter 7 estate, Mr. Formica and his wife entered into a Contract of Sale to sell the Linwood Property for $460,000. Doc. No. 12-1, p. 2, ¶ 7; Doc. No. 35, p. 2, ¶ 9. The purchasers certified that their "young family of four" needed to vacate their prior residence by February 13, 2021, having leased their old home beginning on the date. Doc. No. 35-2, p. 1, Doc. No. 35-1, p. 2, ¶ 10. These purchasers were anxious about closing, believing that if closing were delayed, they would have had to secure other housing such as a long-term hotel room, something they did not want to do with a toddler and during a pandemic. *Id.*

On January 14, 2021, Mr. Formica through counsel filed a Motion to Compel Sale of Real Estate. Doc. No. 12. There he acknowledged a $306,000 mortgage lien of Parke Bank against the Linwood Property but stated that there were no other liens on the property. Thus, he certified that there would be some proceeds for the trustee. *Id.*, ¶¶ 10, 12.

---

[2] Both loans did have as an event of default the borrowers' bankruptcy filing, Doc. No. 31-2, p. 12, ¶ 24(E); Doc. No. 31-3, p. 11, "Events of Default," ¶ d, but that is not the same as a cross-default provision.

[3] Mr. Formica does not provide the address of the new home. Based on his schedules and Statement of Financial Affairs, it must have been the residence at the time of filing. Doc. No. 1, pp. 2 (petition), 41 (SOFA).

[4] Mr. Formica now states that this was the only offer, but his realtor states it was the highest offer, and in his certification filed in support of his Motion to Compel Sale, Mr. Formica stated that the $440,000 was the "highest offer we received." Doc. No. 12-1, p. 1, ¶ 4.

With his Motion to Compel Mr. Formica also filed an Application to Shorten Time. Doc. No. 13. However, his counsel did not use the court's form Application, which asks the applicant to state what date the applicant would like for the hearing, or the court's Form Order. *See* D.N.J. LBR 6004-5(b). The Application filed by Mr. Formica stated that the closing was scheduled for January 28, 2021 but did not request any particular date for the hearing. The court granted the Application, setting the hearing for January 26, 2021. Doc. No. 15.

On January 17, 2021, Mr. Formica filed an amended certification in support of the Motion to Compel, stating that "[i]t has recently come to my attention that there are three other liens"[5] on the property, as follows:

| | |
|---|---|
| Parke Bank, first mortgage | $306,000 |
| Fulton Bank, judgment lien | 45,000 |
| Nicolette Property Group, LLC, second mortgage | 150,000 |
| Ruth Formica, third mortgage | 181,535 |
| | |
| TOTAL | $682,535 |

Doc. No. 17, p. 2, ¶ 10. It is not known how the Fulton Bank judgment arose. As mentioned, above, the Nicolette mortgage was against Ms. Formica's interest in the property only. Mr. Formica had granted Ruth Formica, his ex-wife, a mortgage to secure his support obligations to her. Doc. No. 29-1, p. 2, ¶ 10(d). Mr. Browndorf alleges that the Ruth Formica mortgage was recorded on December 8, 2020, just one day prior to Mr. Formica's filing of his bankruptcy case. Doc. No. 31-1, pp. 3-4, ¶¶ 16-17. As the sale price of the Linwood Property was $460,000, there would be no proceeds for the bankruptcy estate. Moreover, Mr. Formica would have to negotiate with the lienholders to accept less than the amounts of the security interests.

At a hearing held January 26, 2021 the court declined to grant the Motion to Compel Sale, citing that as a chapter 7 debtor, Mr. Formica did not have the right to enter into the sale contract or to bring the motion, the motion would not have met any of the section 363(f) conditions for a sale out of the ordinary course in any case, and the liens exceeded the sale price so there would be no benefit to the estate.

When questioned at this hearing about Parke Bank's position, its counsel, Eric Browndorf, stated that he had some issues with a Chapter 7 debtor signing a sale agreement without the knowledge or consent of the trustee. But his real concern was that Parke was owed at least $310K, the straight payoff on the first mortgage. After the $310K, he said, there are serious issues what happens to the balance. He continued:

Parke believes, number one, that we have cross-collateralization arguments to make, and maybe we're entitled to the balance. Number two, Fulton clearly is going to try to contend that they have a judgment in 2019 and therefore they are entitled to it. The second mortgage [Nicolette] which was entered in 2020 is really suspect,

---

[5] The failure to originally disclose these known liens is the basis of an adversary proceeding filed by Parke Bank on March 7, 2021 seeking denial of discharge pursuant to 11 U.S.C. § 727. *See* Adv. Proc. No. 21-1191-ABA.

[as it] is also a first mortgage against the wife's lien on the debtor property that is far in excess of what the mortgage is. There's a third mortgage, which was entered December 2020 [Ruth Formica], which may or may not be postpetition [inaudible] the chapter 7 but is clearly postpetition vis-a-vis [inaudible]. So, we definitely smell some issues here with respect to whether any [inaudible] court [inaudible] what should happen to the proceeds and as a consequence of those issues, we really can't see how [inaudible] can do a 363 type of sale by the debtor.

He confirmed that Parke did not consent to the sale.

When the court asked whether it correctly understood that Parke was owed far in excess of the sale price of the property due to cross-collateralization, Mr. Browndorf replied "Ah yes, I believe there is an argument. I do not want to misrepresent to the court." Note that Parke Bank had submitted a payoff letter to the title agency, dated January 21, 2021, asserting a total of $1,483,738.86 owed, i.e., including both the Residential Loan and the Commercial Loan. Doc. No. 29-2, ex. A, p. 3 (forwarding to title company); Doc. No. 29-3, ex. B (letter). The total owed on the Residential Loan was $324,919.94, and the total owed on the Commercial Loan was $1,158,818.92.

Mr. Formica's counsel, Ellen McDowell, stated that, having reviewed Parke's documents, she did not believe that Parke was cross-collateralized. But she suggested that the proceeds be put in escrow until everything could be sorted out.

After the hearing on January 26, 2021, Ms. McDowell asked Mr. Browndorf whether he was willing to sign a Consent Order for abandonment. Doc. No. 29-4, ex. C, p. 2. In stating that he was, Mr. Browndorf added, "If you get everyone else on board with sale and leave something extra on the table for our costs and our cross collateralization argument I am fairly certain I can get Parke to consent to a sale. I think you need to get consent from Fulton, the second and the third. Let me know if this happens." *Id.* Ms. McDowell forwarded a proposed order, and Mr. Browndorf responded "No objection. You are welcome to e sign for me to extent necessary as it only relates to Abandonment. If you can get everyone else's approval on global resolution send their written consent and provide for at least 35-45k extra for us and I will recommend it and I would expect to get it done very quickly." *Id.* It is not clear how or why Parke went from a payoff of $1,483,738 on January 21 to only $35,000 to $45,000 above the Residential Loan payoff five days later.

On January 27, 2021, the court entered a Consent Order for Abandonment signed by counsel for the chapter 7 trustee, Mr. Formica, Ruth Formica, Parke Bank, Fulton Bank, and Nicolette Property Group, denying the Motion to Compel Sale and abandoning the property, allowing Mr. Formica to close the sale outside of the bankruptcy process. Doc. No. 26.

Mr. Formica submitted email messages between counsel beginning on January 26. At that point, Mr. Browndorf asked that Ms. McDowell have her client pay $35,000 to $45,000 above the Residential Loan payoff, then reduced that to $10,000. Doc. No. 29-4, ex. C, p. 2; Doc. No. 29-6, ex. E, p. 2.

On January 27, the title agency prepared a Settlement Statement omitting the payoff amounts on the Commercial Loan. Doc. No. 29-6, ex. E, p. 2. Mr. Browndorf then believed that there would be $55,000 in proceeds paid to the Formicas. He also apparently decreased Parke's extra payment request to $10,000. At 2:29 p.m. he stated:

> Again, if all of the assumptions are right, the minor 10k adjustment to the Parke Payoff would still leave 22,500 for him and his wife and 22,500 for his ex-wife Ruth.

Doc. No. 29-6, ex. E, p. 2.

Tensions now start to rise, as Mr. Formica called certain other attorneys at Mr. Browndorf's firm, with whom his companies had worked, to get a payoff so that the Formicas could close the sale. Doc. No. 29-22, p. 2, ¶¶ 7-8; Doc. No. 29-1, p. 7, ¶ 33. Mr. Browndorf asked Ms. McDowell at 5:16 p.m. to advise Mr. Formica that the firm would only deal with him through counsel and accused Mr. Formica of trying to "squeeze" his partners. Doc. No. 29-7, ex. F, p. 2. He also wrote "I urge you to speak to Frank immediately and tell him to immediately empower me to try and get him authority to take a mere 10k under these circumstances. He is making a mistake trying to squeeze others, including my partners, principals of the Bank or otherwise." Doc. No. 29-7, ex. F, p. 2. Ms. McDowell replied:

> I urge you to have your client issue a payoff that reflects Parke's first mortgage only. That is all Parke is entitled to as you well know.
>
> Unless that happens by tomorrow morning, there could be unpleasant consequences for your client and others.

Doc. No. 29-7, ex. F, p. 2.

The title company then amended the Settlement Sheet, providing for Nicolette and Ruth Formica to split the net proceeds. Doc. No. 29-9, ex. H, p. 2.

On January 28, the discussions continued. Mr. Browndorf asked Ms. McDowell "Now that you have had some time to calm down have you decided how you wish to proceed?" Doc. No. 29-10, ex. I, p. 2. Ms. McDowell responds:

> I am as calm as ever and I sincerely hope that you are too.
>
> I wish to proceed as follows: my client wants your client to have every dime it is entitled to from the sale of 153 Glenside Avenue.
>
> My client would like your client to issue a payoff to the title company that sets forth what is due under its mortgage on 153 Glenside Avenue and further represents that upon receipt of that amount it will release its lien so that the sale can go forward.

My client has made deals with the junior lienholders to compromise their claims and take the remaining proceeds of sale as you are aware.

My client will not walk away from this settlement with a single dime.

Please do what is necessary to allow the sale to proceed.

*Id.*

Mr. Browndorf replied January 28 at 10: 52 a.m. that "Our exchanges from Wednesday night [Ms. McDowell suggesting "unpleasant consequences] were shared with my client. Needless to say your explicit threats were not well received. I have thick skin but it would behove [sic] you to explicitly withdraw these threats and apologize in writing." Doc. No. 29-11, ex. J, p. 2. He reminded Ms. McDowell that her client violated the Bankruptcy Code by entering into a contract for sale while in Chapter 7 and falsely swore in an affidavit attached to the Motion to Compel that there were no other liens on the property. *Id.* He continued:

When I advised you that there were two other mortgages on the property you feigned surprise and indicated that was not what Frank told you. As I believed your assertion at the time, I sent you the title searches and copies of both mortgages.

Immediately thereafter you filed an Amended Certification of your client wherein he alleged that he just discovered these liens. You had the audacity to submit this Amended Certification, under oath, alleging these liens were "just discovered" notwithstanding the fact, upon information and belief, the Title Company, prior to the submission, had shared this information and notwithstanding the fact that negotiations with respect to the liens were already moving forward and may have even been concluded.

\* \* \*

The aforesaid conduct alone would be more than sufficient grounds for an action to deny your client his discharge and/or to deny him, at a minimum, the ability to discharge my client's unsecured, deficiency claim arising from and pertaining to his various guarantees.

Both mortgages constitute fraudulent conveyances under the Uniform Fraudulent Conveyance Act to say nothing of the Bankruptcy Code. They were clearly designed to benefit Frank and his wife. Neither you nor Frank dispute the fact that both were put in place with absolutely no consideration.

Brian Thomas, the Trustee, indicated multiple times, including on the record before the Court, that these mortgages appeared invalid. He only abandoned the property because of his view that between the cost of setting them aside and selling the property the dollars recovered would only allow him to make a de minimus distribution to creditors. . . .

Further, as we discussed, it is undisputed that subsequent to the first mortgage your client signed personal guarantees and other loan documentation providing for cross collateralization. To the extent that the express cross default language in the residential mortgage is not sufficient, which we believe it may very well be, certainly this subsequent documentation serves to amend the residential mortgage and provide cross collateralization. . . .

*Id.*, pp. 2-3. Parke did not submit any "subsequent" documents. Cross default language—making the default under one loan a default under another—does not create cross-collateralization. *See, e.g., In re Lynx Assocs., L.P.*, 2009 WL 116062, at *1 & nn. 2-3 (D.N.J. Jan. 16, 2009) ("A cross-default provision is a 'provision in a loan agreement that puts the borrower in default if the borrower defaults on another obligation.' http://www.investorpedia.com. . . . A cross-collateralization provision is a term used when the 'collateral for one loan also serves as collateral for other loans.' http://www.moneyglossary.com.").

Mr. Browndorf ended with:

I will not banter with you further. I think it is utterly foolhardy for you, your client, or any of the lien holders to refuse this generous and de minimus offer so that closing can occur tomorrow. Please send me a revised HUD-1 well prior to your closing so I can get final approval to send a reduced payoff to the title company.

Your immediate attention to the above is required.

*Id.*, p. 3.

Ms. McDowell responded on January 29 at 8:53 a.m.:

Eric, the bulk of your assertions are totally unfounded and I will not respond to them.

So far you have articulated no reason for my client to allow yours to take more funds from the closing than the payoff on the mortgage allows except for "just because."

"Just because" is not a good reason, nor is some theory of how the mortgage was somehow amended to allow for cross-collateralization (it says nothing about cross-collateralization and I know you are aware of that). . . .

Doc. No. 29-12, ex. K, p. 2. But then she asked:

Does this email below [ex. J] suggest that your client will provide [a] full and final release to Frank and Amy in exchange for $10,000? If that is what you are saying I will discuss with them.

Otherwise, we are back to where we were yesterday. Your client needs to submit a payoff so this transaction can close at 4 p.m. today.

*Id.* Mr. Browndorf replied at 9:03 a.m.:

If you mean by full release that we will abandon the cross-collateral argument, not proceed with a nondischargeability claim or move to set aside the mortgages as fraudulent conveyances in exchange for an increase on the HUD-1 of 10k then I will recommend it.

Please speak with your client, obtain authority and put your proposal in a short, clear writing and I will seek authority immediately thereafter.

Doc. No. 29-13, ex. L, p. 2. At 11:08 a.m., Ms. McDowell agreed:

Please get me a proposed release. My clients will sign it and permit the payment to Parke of $10,000 over and above the mortgage payoff (assuming the mortgage payoff is correct) if the release is a full and final release of all claims.

Doc. No. 19-14, ex. M, p. 2.

But at 11:34 a.m., Mr. Browndorf conveyed that while Parke agreed to letting the sale go forward for the $10,000, it would not provide a release. Doc. No. 29-15, ex. N, p. 2. At 12:03 p.m., he sent a revised payoff. Doc. No. 29-16, ex. O, p. 2.

At 1:36 p.m., attorney Stanger chimed in, stating:

Thank you for supplying. There is an issue with the Parke Bank payoff. It appears to have a "10K as agreed" . . . which was NOT AGREED from our client or the sellers, as I understand from Ellen McDowell, Esq. I expect Ellen is dealing with this, but I don't think we can sign off on this net proceeds until that is resolved. Thank you.

Doc. No. 29-17, ex. P, p. 2. But Ms. McDowell called Mr. Stanger "and told him that my clients had finally given in and felt they had no choice to proceed with the closing on Parke's terms." *Id.*, ¶ 49.

Ms. McDowell responded to Mr. Browndorf at 2:14 p.m.:

Eric, I just got this email from Doug and called him. He said his client is not agreeing [to] the "highway robbery" Parke is engaging in and won't let the closing go through on these terms. He said if Parke writes a check to his client to reimburse her for the $5,000 she would lose under your "deal" she will sign off.

He asked me why your demand for additional monies over and above the payoff is not a violation of the automatic stay.

I didn't have an answer for that.

Doc. No. 29-18, ex. Q.

Mr. Stanger also believed there was no cross-collateralization, writing to Mr. Browndorf at 3:09 p.m. as follows:

> This is a clear attempt to go after debtor following bankruptcy. Banks get in trouble for even sending a bill for a debt, unless it is a non-dischargeable debt PERIOD. You claim you have some basis to object to discharge or discharge of debt, but you can't go after assets until and unless a Court Order is entered setting it forth as non-dischargeable—this is exactly what creditors including banks get dinged for. . . . I know of no law [that] provides for securitizing realty as collateral security for another debt without a "collateral mortgage." I trust your client will have that "extra" payment of 10K removed so this can proceed. The court continues to have jurisdiction over this open case. . . .

Doc. No. 29-20, ex. S, p. 2.

Closing occurred on January 29, 2021. The Settlement Statement shows that the lienholders subsequent to Parke Bank agreed to compromise their claims such that, with the other costs and fees, the total debits equaled the total credits:

| | |
|---|---|
| Parke Bank first mortgage | $334,919 |
| Fulton Bank judgment | 30,000 |
| Nicolette Property Group, LLC | 26,628 |
| Ruth Formica | 36,628 |
| | |
| TOTAL | $428,175 |

Doc. No. 29-21, ex. T, p. 2. Fulton agreed to being paid $15,000 less, Nicolette and Ruth Formica split the remainder, except that Parke was paid the extra $10,000 from Nicolette's cut. *Id.* No party stated that anyone reserved their rights in connection with this payoff.

Mr. Formica later submitted certifications of himself, his realtor, the property purchaser, and Ms. McDowell, to support why Mr. Formica felt pressured to yield Parke's demands. Doc. No. 35. He Formica explained that:

> [W]e asked our attorney to do whatever she could to convince Parke's lawyer to back down and let us close by simply paying them what was due on their mortgage. When she was unable to accomplish that, we felt that we had no choice but to go through with the sale. Our reasoning was that (a) we needed to close promptly so that Amy could apply for a conventional mortgage on her new home as the NPG loan matured on May 20, 2021 (as we ran the risk that NPG could sue Amy if she

did not pay the loan by the maturity date);[6] (b) we needed to stop our payment obligation to Parke Bank of $3,100 per month (that payment was reasonable for us when I owned the Formica Brothers Bakery and that business was profitable but it was becoming increasingly difficult for us to pay with my changed circumstances); (c) we were concerned that if we stopped paying the Parke Bank mortgage Parke would commence foreclosure proceedings, causing great harm to Amy, who has not had the same financial difficulties that I have; (d) Parke had made it very clear that they would not agree to voluntarily back down from their position so we would have had to find money to pay our lawyer to file a Complaint and Order to Show Cause to force them to issue the payoff and we had no idea when that would be resolved; (e) even if we chose to ask the buyers to agree to postpone the closing, we could not give them a date certain when the closing would take place (as it was possible that it could be months before we were afforded relief by the Court), so we felt that any such request would be fruitless as well as unfair to the buyers; and (f) if we lost these buyers it might be months before we could get the Property back under agreement and the selling price could well be lower than what we were getting at the closing. And of course, there was an outside chance that the buyers would sue us if did not close and deliver clear title by the contractually fixed closing date.

Doc. No. 35, pp. 3-4, ¶ 12. He added:

Faced with this litany of possible negative repercussions from not proceeding with the sale, and being certain that Parke Bank was legally in the wrong for putting us through this ordeal (I had checked with several lawyers to confirm that there was no cross[-]collateralization), Amy and I made the decision to go forward with the closing.

Doc. No. 35, pp. 3-4, ¶ 13.

The Formicas' realtor echoed a concern that the buyers might back out if closing did not take place on January 28, 2021. Doc. No. 35-1, p. 2, ¶ 2. The buyer stated that "Closing in a timely manner was essential for us in order to make the transition to [the Linwood Property] possible." Doc. No. 35-2, p. 1.

Ms. McDowell characterized Mr. Browndorf's email [message] reporting that Parke would only agree to letting the sale go forward if it was paid $10,000 without any concessions on its part, as "shocking in the extreme as Mr. Browndorf knew full well that we had no deal to allow Parke Bank to take $10,000 additional from the proceeds of sale with absolutely no consideration. However, Mr. Browndorf also knew that closing was just four hours away and that he had Frank and Amy Formica in an impossible situation. As set forth hereinafter, Mr. Browndorf pressed his advantage unmercilessly [sic]." Doc. No. 29-1, p. 11, ¶ 45. "Of course[,] Mr. and Mrs. Formica

---

[6] Mr. Formica's argument about being pressured to close because of the loan's looming maturity date is weakened by his failure to originally disclose this encumbrance.

never 'agreed' to pay an additional $10,000 to Parke Bank over and above its payoff amount, but after a long conversation within which we discussed the outrageous behavior of Mr. Browndorf and his client and the possible repercussions of not going to closing at 4 p.m. that day (including the possibility of a lawsuit by the buyers), the decision was made that there was no choice but to capitulate and go forward on the terms improperly and illegally dictated by Parke Bank." *Id.*, ¶ 47.

# DISCUSSION

## A. Jurisdiction

Before getting into the merits, the court must establish that it has jurisdiction. Parke argued that once the property was abandoned, this court lost jurisdiction. The decision of *Matter of Xonics, Inc.*, 813 F.2d 127 (7th Cir. 1987), dealt with a dispute over rights to property abandoned by the estate. The court there stated that it "had jurisdiction of disputes of this kind under 28 U.S.C. § 157(b)(2)(K) [validity, priority or extent of lien] and (O) at the outset of the case. . . . But . . . jurisdiction does not follow the property. It lapses when property leaves the estate." *Id.*, at 131. *See In re Wilton Armetale, Inc.*, 618 B.R. 424, 436 (Bankr. E.D. Pa. 2020) ("'Usually, abandonment of property will end the court's jurisdiction to determine disputes concerning that property, unless the result of the dispute could have some effect on the bankruptcy case....'") (quoting *Collier on Bankruptcy*, at ¶ 554.02); *In re Siegel*, 86-02795S, 1992 WL 6852, at *3 (Bankr. E.D. Pa. Jan. 14, 1992). Accordingly, here, Parke is correct that a bankruptcy court loses jurisdiction over a validity/priority/extent lien issue on property when that property has been abandoned.[7]

But what is before the court is an allegation of violation of the automatic stay, which for its resolution requires that the court determine whether Parke's $10,000 payment was on account of a secured or unsecured claim. That issue is resolved by resort to the note and mortgage documents. This court certainly has jurisdiction to determine that issue within the context of the stay violation allegation.

The stay applies to all actions brought against a debtor, regardless of whether the assets in question are property of the debtor's estate. *See Raymark Indus., Inc. v. Lai,* 973 F.2d 1125, 1130 (3d Cir. 1992) (citations omitted). In addition, any act to obtain property or exercise control over property of the estate, or to "collect, assess, or recover a claim against the debtor that arose before the commencement of the case" constitutes a violation of the automatic stay. 11 U.S.C. §§ 362(a)(3) and (6). . . . The stay is in effect until a court orders it vacated, until a court grants or denies

---

[7] Even before abandonment, it is questionable whether the bankruptcy court would have had jurisdiction over the validity/priority/extent dispute considering "the outcome of [the] proceeding could [not] conceivably have [had] any effect on the estate being administered in bankruptcy." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 164 (3d Cir.2004) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), overruled on other grounds, *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995)). *See In re Biolitec, Inc.*, 13-11157 (DHS), 2015 WL 351201, at *8 (Bankr. D.N.J. Jan. 22, 2015) ("jurisdiction may be retained even after the transfer of property from the debtor's estate if the relief sought directly implicates bankruptcy court orders[,]").

a discharge, or until a case is closed or dismissed. *In re Hawk,* 314 B.R. 312, 314 (Bankr. D.N.J. 2004) (citations omitted).

*In re Mattera*, 05-39171 (DHS), 2007 WL 594908, at *4 (Bankr. D.N.J. Feb. 21, 2007).

Though the automatic stay of an act against property of the estate continues until the property is no longer property of the estate, 11 U.S.C. § 362(c)(1), the stay of any other act in a chapter 7 case remains until the time a discharge is granted or denied. 11 U.S.C. § 362(c)(2)(C). As no discharge has been granted or denied yet, the stay is still in force over acts to collect prepetition claims.


## B. Stay violation

### 1. Request for payoff

Mr. Formica alleges that Parke Bank violated the automatic stay by demanding $10,000 on an unsecured claim, i.e., either that the loans were not cross-collateralized or that Parke was attempting to recover on Mr. Formica's unsecured guaranty of the Commercial Loan.[8] "[T]he protections of 11 U.S.C. § 362(a)(6) are very broad in scope. *In re Malloy*, 572 B.R. 551, 556 (Bankr. E.D. Pa. 2017). "Any act taken by a creditor designed to collect a prepetition debt violates the stay if it amounts to pressure on the debtor to pay." *In re Draper*, 237 B.R. 502, 505 (Bankr. M.D. Fla. 1999). A willful violation of the stay subjects a party to damages. 11 U.S.C. § 362(k)(1).

A creditor "willfully" violates the stay when he or she does so with knowledge of the bankruptcy. *In re Malloy,* 572 B.R. at 555. "Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts [that] violate the stay be intentional..." *Vu v. Lin (In re Vu),* 591 B.R. 596, 603 (Bankr. E.D. Pa. 2018) (quoting *Lansdale Family Rests., Inc. v. Weis Food Serv. (In re Lansdale Family Rests., Inc.),* 977 F.2d 826, 829 (3d Cir. 1992)); *In re Malloy,* 572 B.R. at 555 (citing *Lansaw v. Zokaites (In re Lansaw),* 853 F.3d 657, 664 n. 4 (3d Cir. 2017)).

*In re Johnson*, 601 B.R. 365, 377 (Bankr. E.D. Pa. 2019). It does not matter that the stay violation is based on a mistake of law.

A good faith mistake of law or dispute as to the creditor's right to take the action does not negate the willfulness of the violation. *In re Nixon,* 419 B.R. 281, 288 (Bankr. E.D. Pa. 2009); *Dean v. Carr (In re Dean),* 490 B.R. 662, 673 (Bankr. M.D. Pa. 2013) ("'[A]

---

[8] Mr. Formica cites section 362(a)(1) as prohibiting any act "to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). But the full sentence provides for a stay of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor . . . to recover a claim against the debtor that arose before the commencement of the case under this title." *Id.* Parke did not "continue" anything; its action was triggered by Mr. Formica's request for payoff numbers. However, section 362(a)(6) says what Mr. Formica alleges, staying "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6). The court will proceed as though Mr. Formica cited subsection (a)(6).

creditor's good faith belief that it had a right to [a debtor's] property is irrelevant' to the question of whether the creditor has willfully violated the stay.").

*Id.*

Parke argued that simply negotiating a payoff cannot be a stay violation, else creditors would violate the stay any time a debtor sold property subject to liens. But courts considering whether issuing a payoff letter with an incorrect amount violates the stay distinguish between issuing a letter at the debtor's request that contains an innocent error and coercing or harassing a debtor into paying an amount the creditor is not entitled to. "All the courts that have adopted this 'post-petition settlement' exception have the same standard – if the negotiations are coercive, if threats are made, if the debtor is harassed, the discussions are violations of the automatic stay." *In re Lyubarsky*, 615 B.R. 924, 930 (Bankr. S.D. Fla. 2020). *See In re Knowles*, 442 B.R. 150 (B.A.P. 1st Cir. 2011):

> For instance, a "mere request for payment" does not violate the stay unless it is coercive or harassing. *Id.* Likewise, an act does not violate the stay unless it immediately or potentially threatens the debtor's possession of its property, such that the debtor is required to take affirmative acts to protect its interest. *Id.*

*Id.*, at 160 (quoting *Morgan Guar. Trust Co. of N.Y. v. Am. Sav. & Loan Ass'n (In re Morgan Guar. Trust Co. of N.Y.)*, 804 F.2d 1487, 1491 (9th Cir. 1986)). *See also In re Zotow*, 432 B.R. 252, 259 (B.A.P. 9th Cir. 2010) ("In the end, one distinguishing factor between permissible and prohibited communications is evidence indicating harassment or coercion."); *In re Sciortino*, 561 B.R. 260, 273 (Bankr. N.D. Ga. 2016) ("'Any act taken by a creditor designed to collect a prepetition debt violates the stay if it amounts to pressure on the debtor to pay.'") (quoting *In re Draper*, 237 B.R. 502, 505 (Bankr. M.D. Fla. 1999)); *In re Keaty*, 350 B.R. 723, 726 (Bankr. W.D. La. 2006) ("[T]his court agrees that post-petition settlement negotiations, following a pattern of pre-petition negotiations, does not violate the provisions of section 362(a), provided that the creditor does not engage in "coercive or harassing tactics." Under the facts presented, the court concludes that Mr. Danner's conduct was neither coercive nor harassing.").

For example, the court in *In re Redmond*, 380 B.R. 179 (Bankr. N.D. Ill. 2007), *subsequently aff'd sub nom. Redmond v. Fifth Third Bank*, 624 F.3d 793 (7th Cir. 2010), held that a payoff letter issued at the debtor's request that included an amount eliminated by an Agreed Order was not an attempt to collect those sums, "but simply statements of the bank's position as to what was owed." *Id.*, at 186. "[W]hether the payoff letters were correct or incorrect is irrelevant to the question of whether the stay was violated. . . . The bank did not seek payment by issuing the letters; rather, it issued them in response to Redmond's demand, prompted by his desire to make a voluntary payment of the mortgage debt." *Id.*, at 186-87.

Similarly, the payoff statements in *Knowles* were requested by the debtor, stated that they were provided pursuant to that request, and made clear that the debtor "was not immediately obligated to pay anything beyond her normal mortgage payment and that the 'total amount due' was only if the Debtor opted to pay off the loan in full." *Id.*, at 161. The Appellate Panel

emphasized "With respect to allegations of a stay violation, the question is not whether certain fees are proper, but whether the creditor acted against property of the Debtor or the estate." *Id.*

In contrast, in *In re Sullivan*, 367 B.R. 54 (Bankr. N.D.N.Y. 2007), an attorney for Washington Mutual issued a payoff letter including a line item for attorney fees of $500 that the attorney was not entitled to collect. *Id.*, at 57. Prior to the sale, the attorney refused to release an abstract of title until the $500 attorney fees were paid by the debtor. The debtor sold the property, paying Washington Mutual only the principal, interest and late charges. Thereafter, the court found that the attorney knowingly had attempted to collect fees he was not entitled to and that constituted a willful violation of the automatic stay. *Id.*, at 63. It further held that "Any good faith mistake of law Shapiro may have made . . . or the purportedly 'informational' nature of the Payoff Letter is irrelevant, as is any lack of intention on its part to violate the automatic stay in this case." *Id.*

The *Redmond* court criticized *Sullivan* in reasoning echoed by Parke Bank in this case:

> The decision, though, is not persuasive. If a payoff letter with an incorrect loan balance were an attempt to collect the underlying debt, then a payoff letter with the correct balance would also be an attempt to collect. The automatic stay makes no distinction between collection activities based on the accuracy of the amount claimed. All activity to collect prepetition debts or enforce prepetition liens is prohibited. For both accurate and excessive claims, collection efforts are prohibited. Thus, if Redmond's position were correct, *all* payoff letters requested by debtors in bankruptcy would violate the automatic stay—a position completely without support in either precedent or bankruptcy policy.

*Redmond*, at 187 (emphasis in original).

But the *Redmond* decision omits that the attorney in *Sullivan* refused to issue an abstract of title, i.e., to hold up closing, unless he was paid the fees. Thus, *Sullivan* does not stand for the proposition that "*all* payoff letters . . . violate the automatic stay," as *Redmond* contends. *See In re Glenn*, 03-15220-MAM-13, 2010 WL 2203042, at *3 (Bankr. S.D. Ala. May 28, 2010) ("This case is unlike *In re Sullivan*, 367 B.R. 54 (Bankr. N.D.N.Y. 2007) in which the posting of the fee was followed by a refusal to turn over an abstract of title necessary to sell the debtor's home.").

Thus, this court must look to whether Parke coerced or harassed Mr. Formica into paying on a prepetition claim that Parke was not entitled to have paid from the proceeds of the Linwood Property.

> It is clear [that] "coercive, threatening, or harassing statements made by creditors to bankruptcy debtors can violate the automatic stay." *Jennings v. Town of Greene (In re Jennings)*, 304 B.R. 8, 11 (Bankr. D. Me. 2004) (citing *Diamond v. Premier Capital, Inc. (In re Diamond)*, 346 F.3d 224, 227–28 (1st Cir. 2003). When deciding whether coercive, threatening or harassing statements made by creditors to bankruptcy debtors violate the automatic stay, at least one court has noted that the court must account for the immediateness of any threatened action and the context in which the statement is made. *Id.* at 13 (citation omitted).

*In re Cruz*, 05-45916 DHS, 2006 WL 4457336, at *3 (Bankr. D.N.J. July 26, 2006).

Whether an action is coercive or harassing when directed only to counsel depends on whether the debtor is aware of the statement. *Compare In re Diamond*, 346 F.3d 224, 228 (1st Cir. 2003) ("The fact that the statement was made by Premier's attorney to Diamond's attorney does not detract from its coerciveness. . . . [W]e do not find it determinative that the statement was made to Diamond's counsel rather than to Diamond himself, particularly where counsel swiftly communicated the threat to his client."), *with In re Barnes*, 2:19-BK-24787-RK, 2020 WL 6928623, at *6 (Bankr. C.D. Cal. July 10, 2020) ("Thus, a non-coercive, non-harassing settlement communication on behalf of a creditor such as we have here in the Email is not prohibited as being in violation of the automatic stay, but is permitted if carefully done as here where the communication went to counsel rather than directly to the debtors, contained no demands on the debtors for payment of prepetition claims or threats of further actions against them and whatever actions that had been taken and were being taken against the debtors were pursued only after stay relief was obtained.").

"Whether a communication is permissible or prohibited under Bankruptcy Code § 362(a) is a fact-driven inquiry, and it is not susceptible to any bright line test." *In re Parker*, 14-44083 CN, 2019 WL 386842, at *7 (Bankr. N.D. Cal. Jan. 29, 2019), *aff'd in part, vacated in part, remanded sub nom. In re Jane Parker*, 19-CV-2588-YGR, 2021 WL 1090421 (N.D. Cal. Mar. 22, 2021).

In sum, this court must determine whether Parke wrongly sought to collect a prepetition claim, and if so, whether it did so by coercing or harassing Mr. Formica, amounting to a pressure to pay.

## 2. Prepetition Debt

As explained above, none of the provisions in the Commercial Loan make it secured by the Linwood Property; they only make the Residential Loan secured by the AC Properties. Parke, possibly unintentionally, recognizes this in describing the cited Commercial Loan provisions as creating a dragnet clause:

Unequivocally, by including this [paragraph 24] language in the Commercial Loan documents, Parke and Debtor sought to link this Commercial Loan with any additional obligations of Debtor to Parke and any accompanying security agreements.

Read together, paragraphs 18 and 24 of the Mortgage and Security Agreement for the Commercial Loan create a type of "dragnet clause" that pledges not only the real property specifically identified in the Commercial Loan documents, but also any after-acquired property of Debtor that is also pledged to Parke on any future indebtedness.

Doc. No. 37, p. 3.

But a dragnet clause in a mortgage only provides that *that mortgage* will secure loans made before or after the mortgage, as well as the loan that is contemporaneous with the execution of the mortgage. *In re Becker*, 415 B.R. 360, 363 (E.D. Wis. 2009). *See, e.g., In re Watson*, 286 B.R. 594, 597 (Bankr. D.N.J. 2002) (involving collateral securing any advances taken then or in the future, any other loans with the credit union, and any other amounts owed the credit union then or in the future); *Lorusso v. Schaible*, A-3464-09T4, 2011 WL 4388355, at *5 (N.J. Super. Ct. App. Div. Sept. 22, 2011) ("Generally, dragnet clauses 'state[ ] that the mortgage will secure not only the debt incurred in the instant mortgage transaction, but in addition all other debts or obligations that are presently owed or may in the future be owed to the mortgagee by the mortgagor.'") (quoting *Restatement (Third) of Property: Mortgages* § 2.4 comment (1996)). The Uniform Commercial Code expressly allows such "future advance" clauses. *See* N.J.S.A. 12A:9-204(c).

What Parke needed in order to make the Linwood Property security for the Commercial Loan was a "floating lien" by which all after-acquired property becomes subject to the Commercial Loan's mortgage.

> As the statute indicates, one must distinguish between after-acquired property clauses and future-advance clauses. After-acquired property clauses provide that later-acquired property secures earlier liabilities or commitments. Future-advance clauses provide that the described collateral or security agreement will secure later liabilities. The after-acquired property clause is frequently referred to as a "floating lien," with the "dragnet" designation sometimes being reserved for the future-advance clause.

https://www.abi.org/abi-journal/the-enforceability-of-dragnet-clauses (last accessed April 6, 2021). *See also In re Smith's Home Furnishings, Inc.*, 265 F.3d 959, 965 (9th Cir. 2001) (referring to a security interest in after-acquired property as a floating lien); *In re Wesley Indus., Inc.*, 30 F.3d 1438, 1442 (11th Cir. 1994) (same); *Toyota Indus. Trucks U. S. A., Inc. v. Citizens Nat. Bank of Evans City*, 611 F.2d 465, 473 (3d Cir. 1979) ("It appears that these mortgages established a perfected floating lien by which all present or after-acquired inventory in Promat's possession became subject to CNB's security interest."); *Lorusso v. Schaible*, A-3464-09T4, 2011 WL 4388355 (N.J. Super. Ct. App. Div. Sept. 22, 2011):

> In this respect, there is a difference between antecedent and subsequent debts. *See Restatement, supra,* at § 2.4 comment b ("A dragnet clause can have only a prospective effect."); *see also Lundgren, supra,* 756 P.2d at 278 ("A key rationale underlying these holdings is that since the antecedent debt is already owed by the borrower to the lender, the parties would have had no good reason not to identify it in the subsequent security instrument if they had truly intended the deed of trust or mortgage to cover it.").

*Id.*, at *7. Nothing in the Residential Loan documents references the Commercial Loan.

A dragnet clause did not entitle Parke to proceeds of the Linwood Property on account of the Commercial Loan. Either Parke was wrongly attempting payment on the Commercial Loan that was not secured by the Linwood Property, or it was wrongly attempting payment from collateral on Mr. Formica's unsecured guaranty of the Commercial Loan. Either position impermissibly attempts collection of a prepetition claim. That Parke was wrong about its cross-collateralization theory does not save it from violating the stay.

### 3. Coercion or Harassment

The court next considers whether Parke's actions were coercive or harassing.[9] Under the facts presented, the court cannot conclude that Parke's conduct was coercive or harassing – distasteful yes, but considering all the facts, not to the level of coercive or harassing required to find a stay violation.

While Mr. Browndorf browbeat Ms. McDowell, behavior that concerns this court,[10] none of the email messages between Ms. McDowell and Mr. Browndorf copied in Mr. Formica, and Mr. Formica did not allege that Ms. McDowell "swiftly communicated" Parke's demands to Mr. Formica or only spoke to him the morning of the closing when he agreed to pay the $10,000. Mr. Formica has not shown that *he* was coerced or harassed into conceding.

Reviewing the email messages between Mr. Browndorf and Ms. McDowell reveals just a pattern of "pay us $10,000 extra" followed by "you have no right to that." Counsel repeated this "pay/he won't pay" pattern throughout the days and hours prior to the scheduled closing. It ended with Ms. McDowell counter-offering to pay the $10,000 if Parke would grant certain releases, Parke declining, and Mr. Formica proceeding to close anyway.

The only communication from Mr. Browndorf that might be considered menacing was sent the morning of January 28. Therein, he reviewed that Mr. Formica wrongly entered into the contract of sale, alleged that there would be a benefit to the estate, and swore that there were no liens other than Parke's on the property even though the Nicolette and Ruth Formica mortgages

---

[9] Parke Bank issued a payoff letter that included the $1,158,819 owed on the Commercial Loan. However, it did so at the debtor's request, and differentiated between amounts payable by Mr. Formica and those payable by John Galt LLC. Mr. Formica has not contended that that action violated the stay.

Parke argued that Federal Rule of Evidence 408 prohibits admission of settlement discussions. This argument strikes wide of the mark. Rule 408 provides that evidence of compromise offers and negotiations are not admissible "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." F.R.E. 408(a). None of that is attempted here.

[10] As does unnecessarily belligerent statements such as this in Parke's response, particularly considering that Parke was wrong on the law:

> If McDowell truly believes that we should uproot our judicial system and make positions taken in negotiations discoverable and subject to examination, she should run for Congress and change the law as opposed to filing these types of frivolous motions without a basis in law or fact.

Doc. No. 37, p. 13.

had recently been granted. Mr. Browndorf stated that all of this would be sufficient to deny Mr. Formica's discharge or the dischargeability of Parke's unsecured claims on Mr. Formica's guarantees. He continued that the Nicolette and Ruth Formica mortgages were fraudulent conveyances that Parke could set aside in addition to pursuing non-dischargeability of its claims. He pointed out that those two mortgages benefitted Mr. Formica in reducing the balance of the mortgage on the Absecon Property and keeping him from having to pay his support arrears from his income. Mr. Browndorf stated that if the "express cross-default language" in the Residential Loan documents were not enough to create cross-collateralization, then "subsequent documentation" amended the Residential Loan and provided for cross-collateralization. If Parke was right, then it would receive all the money from the sale of the Linwood Property. He closed with "I will not banter with you further. I think it is utterly foolhardy for you, your client, or any of the lien holders to refuse this generous and de minimus offer so that closing can occur tomorrow."

But, this is not the situation found in *In re Diamond*, 346 F.3d 224 (1st Cir. 2003), where the creditor's attorney told the debtor's attorney that if the debtor did not settle in the creditor's favor, the creditor would attempt to revoke the debtor's real estate license, leaving the debtor between a rock and a hard place." *Id.*, 227.

> If he prevailed in the § 727 proceeding, as he ultimately did, he would face an administrative proceeding and quite possibly the revocation of his real estate license, the source of his livelihood. If Premier prevailed in the § 727 proceeding, then Diamond would suffer because he would not obtain a discharge of his debts. Thus, Diamond would lose either way.

*Id.*, 227-28. Here, Mr. Browndorf was merely pointing out that the Nicolette and Ruth Formica mortgages were suspect, such that maybe Mr. Formica should take what he could get, because otherwise, Parke could claim all of the Linwood Property proceeds. But Ms. McDowell and Mr. Formica knew that the cross-collateralization claim was false.[11] Thus the threat was empty. *Compare In re Diamond*, 346 F.3d 224, 228–29 (1st Cir. 2003) ("If the threat was an empty one— in other words if it lacked a good faith basis—we do not think that Premier would have made it at all."). "What makes settlement negotiations problematic are their tone, context and content, and the inclusion of any threat of continued legal action outside of the Bankruptcy Court should the debtor reject the offer. Such coercive language may violate the automatic stay." *In re Parker*, 14-44083 CN, 2019 WL 386842, at *7 (Bankr. N.D. Cal. Jan. 29, 2019), *aff'd in part, vacated in part, remanded sub nom. In re Jane Parker*, 19-CV-2588-YGR, 2021 WL 1090421 (N.D. Cal. Mar. 22, 2021).

While the statements about discharge, non-dischargeability and fraudulent transfers appear threatening, they were not to Ms. McDowell.

> Eric, the bulk of your assertions are totally unfounded and I will not respond to them.

---

[11] Recall that Mr. Formica certified that he "had checked with several lawyers to confirm that there was no cross-collateralization." Doc. No. 35, pp. 3-4, ¶ 13.

So far you have articulated no reason for my client to allow yours to take more funds from the closing than the payoff on the mortgage allows except for "just because."

"Just because" is not a good reason, nor is some theory of how the mortgage was somehow amended to allow for cross-collateralization (it says nothing about cross-collateralization and I know you are aware of that). . . .

Does this email below [ex. J] suggest that your client will provide [a] full and final release to Frank and Amy in exchange for $10,000? If that is what you are saying I will discuss with them.

Otherwise, we are back to where we were yesterday. Your client needs to submit a payoff so this transaction can close at 4 p.m. today.

In other words, she stuck to her guns, insisting—correctly—that Parke only had a right to payoff of the Residential Loan balance. She counter-offered, seeking a full release. As an experienced bankruptcy practitioner, Ms. McDowell could evaluate the strength of Parke's legal arguments regarding discharge, non-dischargeability, and fraudulent transfers. She considered them groundless. Coupled with the lack of evidence that she communicated any of Parke's message to Mr. Formica, the court cannot consider the message coercive or threatening.

Only a few published cases expressly discuss considering a debtor's consent to a potential stay violation.

In denying that a violation of the automatic stay occurred, Chase does not argue that the repossession of a debtor's property is not prohibited by § 362. Instead, Chase defends its actions by arguing that no violation occurred because the Debtor consented to the repossession. . . . The alleged consent of a debtor to conduct that otherwise would be a violation of the automatic stay is an affirmative defense. It follows in the present case that Chase therefore had the burden of proving such defense by a preponderance of the evidence.

In re Ware, 02-12262C-11G, 2003 WL 1960454, at *7 (Bankr. M.D.N.C. Apr. 24, 2003). See In re Kuzniewski, 508 B.R. 678, 687 (Bankr. N.D. Ill. 2014) ("Where a debtor voluntarily initiates an automatic payroll deduction arrangement to pay a pre-petition debt, for example, the creditor violates the stay by continuing to deduct such amounts post-petition without the debtor's formal post-petition consent."); Matter of Holland, 21 B.R. 681, 687 (Bankr. N.D. Ind. 1982) (stating that "the transfer by a creditor of post-petition money received pursuant to a pre-petition automatic withdrawal-loan repayment arrangement to pay a pre-petition debt owed to that creditor is a violation of the automatic stay unless there is clear evidence that, post-petition, the debtor actually demonstrated his or her willingness to voluntarily have post-petition earnings applied to a dischargeable pre-petition debt."). Along the same lines, a debtor's consent might just "undermine[] [his or her] right to damages for a violation of stay . . . ." In re Shriver, 46 B.R. 626, 631 (Bankr. N.D. Ohio 1985).

In *Shriver*, the debtor filed his bankruptcy case and then left the state. *Id.*, 630. When his creditors came to his farm to check on the condition of the debtor's cattle, the debtor chose not to speak to them and said that they "could take the cattle if they so desired." *Id.* The court stated:

> This fact situation is just one small step away from a debtor who in bad faith files to reorganize when he knows there is no chance of his survival and then baits his trap by allowing the deterioration of the collateral while remaining silent and out of sight as his creditors begin repossession, all along the debtor hoping to get rich on damages for conversion by using the court as his tool to complete the scheme. This Court refuses to be a part of any such scheme nor does it see the benefit of any sanctions in this case especially in light of plaintiff's silence and the deteriorating nature of the collateral which required quick action.

*Id.*, 630-31.

At the end of the hearing on the Motion for Sanctions, the court had asked Ms. McDowell to address in her brief why she did not just escrow the $10,000 to allow the closing to proceed. She certified that she did not believe Parke would have consented to this.[12] And even had Parke consented, she certified that she believed she would have had to get the other three lienholders to consent also, "all in the space of a few hours." Doc. No. 35-3, p. 2, ¶ 8. "There would have had to be discussions concerning how to deal with accrued interest and how long the proceeds would be in escrow and what the prospects of resolving the issues quickly were. I did not think those issues could be sorted out in the limited time we had to deal with this." *Id.*

Yet Parke had already backed down from $1,483,738 to $35,00-$45,000, to $10,000. Moreover, in the same amount of time, counsel had managed to negotiate compromised claims with the three lienholders, including for Nicolette to take $10,000 less. An agreement as to interest accrual would quash any concern about how long the proceeds would be in escrow, and it did not need to involve Mr. Formica, as whatever the outcome, the $10,000 was not going to him. Ms. McDowell did not even float to Mr. Browndorf the idea of escrow, despite having suggested it three days' prior and despite her absolute confidence that Parke was not cross-collateralized. Indeed, Ms. McDowell knew since at least January 21, five days prior to the hearing on the Motion to Compel Sale, when Parke issued its Payoff Letter, that Parke might be taking the position that the Commercial Loan was also to be paid from the Linwood Property proceeds. So, she had more time for this negotiation than she lets on.

Had Parke refused a request to escrow the funds and Mr. Formica closed under a reservation of rights, then Parke could be looking at serious sanctions at this time. *See In re Sullivan*, 367 B.R. 54, 64 (Bankr. N.D.N.Y. 2007) (relating that closing went forward after attorney improperly seeking payment of additional fees agreed to escrow the fees). Instead, Mr. Formica weighed the pros and cons and decided to move forward, getting the other lienholders on board.

Ms. McDowell is an experienced bankruptcy attorney and Mr. Formica is a sophisticated businessman. Not only did Mr. Formica consent to the $10,000 payment, but so did Nicolette in

---

[12] Considering its hardball negotiating and refusal to release claims, the court gives no weight to Parke Bank's *post facto* statement in its April 15 response that it would have gladly agreed to escrow the $10,000.

agreeing to be paid $10,000 less. *See In re Taylor*, 430 B.R. 305, 315 (Bankr. N.D. Ga. 2010) (finding that the trustee's failure to file a complaint until 11 months after the bank received payoff on the loan "consistent with ratification of Deutsche's use of the funds or an implied waiver of Trustee's stay violation claim against Deutsche.").

Alternatively, Ms. McDowell could have asked for an emergency hearing to enjoin Parke from violating the stay. Indeed, the issue was never formally presented to this court. Even prior to this pandemic, the court heard emergency hearings telephonically, and now during the pandemic, all hearings have been conducted in that manner, such that setting up such a hearing could have been done quickly. Ms. McDowell even had attorney Stanger on her side regarding the lack of cross-collateralization. Ms. McDowell never clearly said to Parke "you are violating the automatic stay *and my client will be filing a motion for sanctions*."

For his part, Mr. Formica argued that he felt he had no choice but to concede to Parke's demand. But he was represented by counsel who was adamant that there was no cross-collateralization, Mr. Formica had consulted other attorneys who confirmed there was no cross-collateralization, and attorney Stanger had also balked at Parke's position. But instead of taking measures against Parke, Mr. Formica decided to just go along with it.

Neither Mr. Formica's nor his realtor's certifications convince this court that no other buyer could be found for this property, only that the Formicas accepted the highest offer. Mr. Formica argues that if he lost those buyers, "it might be months before we could get the Property back under agreement and the selling price could well be lower than what we were getting at the closing." First of all, the bid of $460,000 was over the $449,000 listing price and greater than the earlier, $440,000 offer that asked for "tens of thousands of dollars of repairs," suggesting that the market was getting better. Second, the amount he was getting at this closing already did not cover all of the liens on the property—he needed a purchase price of over $680,000 to avoid again negotiating lower payoffs from his lienholders. That was not Parke's fault. Other than the judicial lien, the Formicas voluntarily over-encumbered the property.

Also unpersuasive to this court is Mr. Formica's statement that he needed to stop paying the $3,100 mortgage payment on the Linwood Property that had been reasonable when Formica Brothers Bakery was profitable. But he filed a no asset chapter 7 bankruptcy case for that business in April 2019, so the time had long past when the Formicas could afford the Linwood Property, and Ms. Formica purchased the Absecon Property a full year after Formica Brothers had filed its liquidation case.

Mr. Formica did not feel he could ask the buyers to postpone the closing because he could not give them a date certain for the closing to take place given all the things that needed to be done in court, asserting that the only way to get Parke to back down from its $10,000 demand would have been to file a Complaint and Order to Show Cause. But a Motion for Violation of the Automatic Stay on an expedited basis (or injunction against stay-violating actions) would have sufficed and is a much quicker process. *See In re Am. Spectrum Realty, Inc.*, 540 B.R. 730, 744 (Bankr. C.D. Cal. 2015) ("Strikingly, during this timeframe, the Debtor, represented by respected and competent counsel, did not file any motion for sanctions for stay violations or any motion seeking this Court to intervene with respect to the Texas Action or the Segregated Account. In

fact, the Debtor did not bring this matter to this Court's attention until September 21, 2015, when the Debtor filed his Motion to Enforce Stay."). Moreover, Mr. Formica had some time—the buyers did not have to be out of their house until February 13, 2021, two and a half weeks from the January 28, 2021 closing date. Alternatively, as the Formicas had already vacated the Linwood Property, they could have entered into a lease agreement with the buyers if the closing were conducted after the buyers moved in, with an offset on the purchase price when they did close.

Mr. Formica also suggested that "there was an outside chance that the buyers would sue us if did not close and deliver clear title by the contractually fixed closing date." But nothing in the buyer's certification suggests that they intended to do anything but try to find another house to buy.

Ill-conceived and/or poorly-executed motion practice created more delay. Mr. Formica accepted this purchase offer after filing his bankruptcy petition when he had no authority to do so. Instead of coming to an agreement with the trustee to abandon the property, Mr. Formica filed a Motion to Compel the Trustee to Sell despite that the Bankruptcy Code provides no authority for this. He asked to be heard on shortened time but left the date for the court to fill in. Two days later, when he filed his amended certification acknowledging the property to be over-encumbered, he did not then ask for an earlier hearing date despite that he would now have to negotiate reduced payoffs with the lienholders in order to close. All of these missteps reduced the time to closing.

Finally, the court finds that Mr. Formica was not damaged. The $10,000 was taken from Nicolette, a claim against the property that Mr. Formica was not liable on. The injury was to Nicolette and/or non-debtor Amy Formica, not Mr. Formica. *In re Wilson*, 454 B.R. 546, 551 (Bankr. N.D. Ga. 2011) ("If the facts were different—if Ocwen had recovered surplus funds and failed to turn them over, then its conduct would have caused injury. However, that is not what happened.").

## CONCLUSION

Based upon all the facts surrounding this matter, the court cannot find that the negotiations were coercive, that threats were made, and Mr. Formica was harassed. Parke may have gotten away with something at closing here, and it certainly leaves a bad taste in the court's mouth, but one cannot consent to action and then turn around and ask for sanctions. "The automatic stay was not designed to be used as a kind of spring-loaded gun against creditors who wander into traps baited by the debtor." *In re Clayton*, 235 B.R. 801, 807 (Bankr. M.D.N.C. 1998).

Accordingly, the debtor's motion is denied.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
Dated: May 12, 2021          United States Bankruptcy Judge